Cardillo & Corbett
Attorneys for Petitioner
TBS MIDDLE EAST CARRIERS, LTD.
29 Broadway
New York, New York 10006
Tel: (212) 344-0464
Tulio R. Prieto

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In the Matter of the Arbitration               :
                                                :
        -between-                               :       **PETITION TO CONFIRM**
                                                :       **ARBITRATION AWARD**
TBS MIDDLE EAST CARRIERS, LTD.,                 :
                                                :
                        Petitioner,             :
        -and-                                   :
                                                :
UNITED QUARRIES,                                :
                                                :
                        Respondent.             :
------------------------------------------------------------x

      The Petition of TBS MIDDLE EAST CARRIERS, LTD., ("TBS") respectfully states to the Court as follows:

      1. Petitioner, pursuant to 9 U.S.C. Sections 9 and 207 et seq., seeks an order confirming an arbitration award relating to disputes which have arisen under a maritime contract and directing the entry of judgment thereon. This Court has jurisdiction under 9 U.S.C. §203 and 28 U.S.C. § 1333.

      2. At all times alleged herein, TBS was and still is a corporation duly organized and existing under the laws of the Marshall Islands.

      3. On information and belief at all material times herein, respondent, UNITED

QUARRIES ("UQ") was, and still is, a foreign business entity organized and existing under the laws of a foreign country with an address at Suite 706, Fujairah Trade Center, P.O. Box No. 2794, Fujairah, U.A.E.

## BACKGROUND

4. Pursuant to a contract of affreightment dated April 26, 2006, TBS agreed to carry and UQ agreed to load approximately 2,000,000 metric tons, 5% more or less in Petitioner's option, of aggregates in bulk per year for a period of three years totaling about 6,000,000 metric tons in lots of 35,000 to 50,000 metric tons, 10% more or less in TBS's option from Fujairah, U.A.E. to Mesaieed, Qatar (the "COA").  A copy of the COA is attached hereto as Exhibit A.

5. A total of 134 liftings were made under the COA.  Except for the proper reconciliation of accounts, there was no dispute between the parties with respect to either the freight or demurrage earned by TBS under the COA.  Rather, the disputes centered mainly on the claims by TBS totaling $1,655,394.49 which amount is composed of $122,753 found in its favor following the reconciliation of accounts, $25,696.78 for the reimbursement of shifting expenses including bunkers at Mesaieed, $138,162.15 for additional war risk premiums and $1,368,782.56 for bunker escalations invoiced to but not paid by UQ.

6. UQ denied responsibility for the amounts claimed by TBS and asserted a counter claim for $605,835.57 representing an address commission of 1.25% payable on both the gross freight and demurrage earned by TBS.

## NEW YORK ARBITRATION

7. On March 20, 2011, TBS demanded Arbitration under Clause 35 of the COA

and nominated Charles L. Measter as its appointed arbitrator.

8. In response, UQ appointed A. J. Siciliano as its arbitrator.

9. The two thus chosen arbitrators then appointed Gerard T. Desmond to serve as third arbitrator and panel chairman for procedural matters.

10. Following the arbitrators' customary disclosure statements, the parties accepted the panel as constituted and advised that the matter would proceed on documents alone.

11. Both parties submitted documentary evidence, as well as sworn declarations. Thereafter the parties exchanged post submission main, reply and sur-reply briefs.

12. After considering the evidence before them, the arbitrators on November 11, 2013, issued their unanimous Final Award (the "Award") in writing in favor of Petitioner as follows:

| | |
|---|---:|
| A. Account Reconciliation Balance | $122,753.00 |
| B. Reimbursement of Additional War Risk Premium | 138,162.15 |
| C. Shifting Expenses | 13,115.71 |
| D. Bunker Escalations | 864,362.07 |
| <u>Less:</u> Address Commission due UA on Freight of $30,271,436.75 X 0.65% | (196,764.33) |
| <u>Add:</u> Simple interest at the annual rate of 3.25% from March 30, 2011 through to the date of this award | 80,154.52 |
| <u>Add:</u> Allowance against TBS's legal fees and costs | 100,000.00 |
| **Total Award due TBS** | **$1,121,783.12** |

13. A true copy of the Award is attached hereto as Exhibit B.

14. Respondent has failed to satisfy the Award despite the demand of Petitioner.

WHEREFORE, Petitioner respectfully prays that this Court pursuant to the

provisions of Sections 9 and 207 of Title 9 U.S.C., enter an order herein confirming the Award of the arbitrators, and that it direct therein that judgment be entered in accordance with said award, together with interest on the Award and the costs of this proceeding.

Dated: New York, New York
      December 17, 2013

                          CARDILLO & CORBETT
                          Attorneys for Petitioner
                          TBS MIDDLE EAST CARRIERS, LTD.

By: _____
       Tulio R. Prieto

       Office & P.O. Address
       29 Broadway
       New York, New York 10006
       Tel No. (212) 344-0464
       Fax No. (212) 797-1212

# EXHIBIT

# A

| 1. Shipbroker | RECOMMENDED THE BALTIC AND INTERNATIONAL MARITIME COUNCIL UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994) (To be used for trades for which no specially approved form is in force) CODE NAME: "GENCON" Part I |
|---|---|
| National Shipping Services LLC. 1st Floor, Sharaf Building P.O. Box 2939 Dubai, United Arab Emirates | **FIRST ORIGINAL** |
|  | 2. Place and date  *Dubai, April 26, 2006* |
| 3. Owners/Place of business (Cl. 1) *TBS Middle East Carriers, Ltd. Majuro Marshall Islands As Disponent Owners* | 4. Charterers/Place of business (Cl. 1) *United Quarries Suite 706, Fujairah Trade Center. P.O. Box No. 2794 Fujairah, United Arab Emirates.* |
| 5. Vessel's name (Cl. 1) *TBS Middle East Carriers, Ltd. vessels to be nominated.* | 6. GT/NT (Cl. 1) |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
| 9. Expected ready to load (abt.) (Cl.1) | |
| 10. Loading port or place (Cl. 1) *One safe berth Fujairah, U.A.E. Charterers guarantee 12.5 meters BSW draft.* | 11. Discharging port or place (Cl. 1) *One safe berth Mesaieed, Qatar. Charterers guarantee 12.5 meters SW draft. Intended terminal: "berth no. 1" but Charterers likely to have to use other berths occasionally.* |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl. 1)  crushed gabbro  *A contract of affreightment of about 2,000,000 (two million) metric tons (about meaning 5% more or less 6% in Owner's option) of aggregates in bulk per year for a period of 3 years totaling about 6,000,000 (six million) metric tons in lots of 35,000 to 50,000 metric tons 10% more or less in Owner's option. See also clause 20.* | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4) *USD $ 4.75 per metric ton free in out trimmed* | 14. Freight payment (state currency and method of payment; also beneficiary and bank account)(Cl. 4) *See Clause 23* |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) *See Clauses 25 & 26* | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only)(Cl. 6) |
| 17. Shippers/Place of business (Cl. 6) *United Quarries, Fujairah, U.A.E.* | (a) Laytime for loading *See Clauses 24 & 25* |
| 18. Agents (loading) (Cl.6) *Merchant Shipping Services LLC, Dubai, U.A.E.* | (b) Laytime for discharging *See Clauses 24 & 26* |
| 19. Agents (discharging) (Cl. 6) *National Shipping & Marine Services Co., Doha, Qatar* | (c) Total laytime for loading and discharging |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7) *US$ 14,000 per day or pro rata/ half dispatch on laytime saved both ends.* | 21. Laydays/Cancelling date (Cl. 9) *See clause 21.* |
| | 22. General Average to be adjusted at (Cl. 12) *New York.* |
| 23. Freight Tax (state if for the Owner's account (Cl. 13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15) *2.5% due to National Shipping Services LLC, Dubai and payable by Owners.* |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19(a) shall apply) (Cl. 19) *Arbitration in New York, U.S. Law to apply. See Clause 35.* | |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) Rider Clauses 20-47 both inclusive, as attached, are deemed to be | 26. Additional clauses covering special provisions, if agreed *fully incorporated herein and are integral part of this contract* |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

Signature (Owners) *For and on behalf of the Disponent Owners* (As per Authority)

TBS Shipping Services Inc. (As Agents Only)
Gregg L. McNelis/Sr Executive VP

Signature (Charterers) *For and on behalf of United Quarries*
By Naim J. Marashly
Managing Director / Partner

Saad Sh. Al-Ajmi
Chairman

This document is a computer generated GENCON 1994 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is copyright of Strategic Software Ltd. (SSL). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, the original BIMCO approved document shall apply. BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

1. It is agreed between the party mentioned in Box 3 as the **Disponent** Owners of the Vessel
named in Box 5, ~~of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7,~~ now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessels **to be nominated** shall, as soon as ~~her~~ **their** prior commitments have been completed,
proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as ~~she~~ **they** may safely get and lie always afloat, and there load a full and complete
cargo(es) ~~(if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility)~~ as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessels shall proceed to the discharging port(s) or
place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

**2. Owners' Responsibility Clause**
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

**3. Deviation Clause**
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

**4. Payment of Freight** - *See Clause 23*
~~(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.
(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.
(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.
Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.~~

**5. Loading/Discharging** - *See Clauses 25 & 26*
(a) *Costs/Risks*
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. ~~The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under~~ this Charter Party and time to count until dunnage has been removed.
(b) *Cargo Handling Gear*
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage. ~~On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers~~ **to operate cranes/grabs** shall be for the account of the
Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants ~~but shall always work under the supervision of the Master.~~
(c) *Stevedore Damage*
The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness, **cargoworthiness, operations, safety of crew** or class before the Vessel sails from the port where such
damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

**6. Laytime** - See Clauses 24, 25 & 26

~~* (a) Separate laytime for loading and discharging
The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
* (b) Total laytime for loading and discharging
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.~~
Time used before commencement of laytime shall count.
~~* Indicate alternative (a) or (b) as agreed, in Box 16.~~

**7. Demurrage** - *See Box 20*
~~Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.~~

**8. Lien Clause** - *See Clause 38*
~~The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.~~

**9. Cancelling Clause**
(a) Should **one of** the Vessels not be ready to load (whether in berth or not) on the
cancelling date **to be agreed** ~~indicated in Box 21~~, the Charterers shall have the option of
cancelling ~~this Charter Party.~~ **such bottom only.**
(b) Should the Owners anticipate that, despite the exercise of due diligence the **a** Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the **bottom** Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then **the mutually agreed laydays** this Charter Party shall be deemed to be amended such that
the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.
~~The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.~~

**10. Bills of Lading**
Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

**11. Both-to-Blame Collision Clause**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**12. General Average and New Jason Clause**
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses

This document is a computer generated GENCON 1994 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is copyright of Strategic Software Ltd. (SSL). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of the document, and should this not be clearly visible, then the original BIMCO approved shall apply. BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

# PART II
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).

If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery."

**13. Taxes and Dues Clause -** *See Clause 30*
(a) *On Vessel* -The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.
(b) *On cargo* -The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.
(c) *On freight* -Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account.

**14. Agency**
In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge.

**15. Brokerage**
A brokerage commission at the rate stated in Box 24 on the freight, deadfreight and demurrage earned is due to the party mentioned in Box 24.
~~In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be agreed.~~

**16. General Strike Clause**
(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.
(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.
(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

**17. War Risks ("Voywar 1993")**
(1) For the purpose of this Clause, the words:
(a) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.
(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons on board the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range of loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The Vessel shall have liberty:-
(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;
(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;
(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;
(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

~~**18. General Ice Clause**~~
~~*Port of loading*~~
~~(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void.~~
~~(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party.~~
~~(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under~~

| | |
|---|---|
| section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port. | 364<br>365 |
| *Port of discharge* | 366 |
| (a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination. | 367<br>368<br>369<br>370<br>371<br>372<br>373 |
| (b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge. | 374<br>375<br>376<br>377 |
| (c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion. | 378<br>379<br>380<br>381<br>382 |
| **19. Law and Arbitration** *See Clause 35* | 383 |
| * (a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final. | 384<br>385<br>386<br>387<br>388<br>389<br>390<br>391<br>392<br>393<br>394 |
| For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association. | 395<br>396<br>397<br>398 |
| * (b) This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.. For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.. | 399<br>400<br>401<br>402<br>403<br>404<br>405<br>406<br>407<br>408<br>409<br>410 |
| * (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party. | 411<br>412<br>413 |
| (d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply. | 414 |
| * (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25. | 415 |
| ** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect. | 416<br>417 |

This document is a computer generated GENCON 1994 form printed by authority of The Baltic and International Maritime Council (BIMCO), using software which is copyright of Strategic Software Ltd. (SSL)
Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original BIMCO approved shall apply.
BIMCO and SSL assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

Rider Clauses to the Charter Party dated April 26, 2006 –
TBS Middle East Carriers Ltd / United Quarries

**CLAUSE 20**
TBS Middle East Carriers Ltd., geared / grab fitted bulk carriers to be nominated suitable for the carriage of aggregates in bulk.

Cargo to be carried in two vessels running simultaneously.

Owner's option for multiple substitutions of the performing vessels during the course of the contract.

**CLAUSE 21**
Contract period commences from the 1st of May 2006 (however laydays for first shipment per next paragraph) and ends on the 30th of April 2009. However, depending on the duration of the voyages, the contract period to be increased/decreased to accommodate carriage of about six million metric tons + 20% more in Charterers' option and keeping the vessels under this contract continuously employed.

Shipments to commence during May/June, 2006. Exact laydays for each vessel's first shipment to be mutually agreed. Upon completion of each vessel's first shipment, all subsequent shipments to be on consecutive voyage basis. If a nominated vessel misses her cancelling date, Charterer's option to cancel such bottom only (not the whole contract). Such bottom is to be reduced fm the overall contract quantity.

Charterer's option to increase the cargo quantity by 20%. This additional quantity to be declared by the Charterers latest by the beginning of the 10th month of each contract year.

The Owners shall not be bound to carry any balance of the total quantity which would be outside an individual bottom quantity i.e. from 35000mt/50000mt 10pct more or less in Owner's option.

Owners shall nominate the first performing vessel or substitute 7 days prior to ETA loading port.

Owners to give Charterers 7 days notice of an intention to substitute for the performing vessel. There is no limit to the number of vessel substitutions that Owners can make.

In the event that the first voyage of either ship is cancelled pursuant to Clause 9 of the Charter Party, then the laydays for the next voyage shall have a 7 days spread commencing 3 days after the cancellation of the first voyage unless sooner requested by Charterers. Thereafter all voyages to be performed on a consecutive voyage basis.

**CLAUSE 22**
Quantity loaded to be calculated for each shipment in accordance with the vessel's draft reading on her departure from loading port. Then Master, on behalf of the Owners, and any surveyor on behalf of the Charterers to draw up and sign relevant statement, which includes:

Draft readings on departure.
Exact metric tons on departure.

Each bottom to be of one grade only. If Charterers require multiple grades, then stowage to be by natural separations & subject to Master's confirmation.

Master to supply Charterers with draft readings on sailing from loading port. This information is given to Charterers only for the purpose of Charterers verifying the quantity stated by their shippers as loaded each voyage.

Similar draft survey will be held at discharge port.

Each party to bear cost of their draft survey. Draft survey time and time awaiting surveys to count as laytime or time on demurrage as the case may be at load and discharge ports.

Rider Clauses to the Charter Party dated April 26, 2006 –
TBS Middle East Carriers Ltd / United Quarries

**CLAUSE 23**
Full Freight on each voyage to be paid upon signing bills of lading marked "Freight Payable as per Charter Party".

Full freight is deemed earned as cargo loaded on board, discount less and non-returnable ship and/or cargo lost or not lost.

Charterers to open a confirmed, revolving, and irrevocable letter of credit payable at sight in favor of Owners from first class banks. This charter party is subject to Charterers opening such letter of credit under terms acceptable to the Owners. The letter of credit to cover freight and an amount equal to four days of demurrage of each voyage. Such letter of credit to be opened within 10 days after signing the COA.

If letter of credit is not opened within 10 calendar days, Owner's option to reconsider the day of nomination of the performing vessels. COA not to commence until letter of credit is fully effected.

Owners banking details:

WELLS FARGO BANK N.A.
707 WILSHIRE BLVD.
LOS ANGELES, CA 90017
ABA #121000248
ACCOUNT NAME: TBS CONCENTRATION
ACCOUNT #: 0468853452
OUR REFERENCE: Vessel name-voyage number/United Quarries.

**CLAUSE 24**
Charterers to get 6 hours free time at load and discharge port each. Time used before commencement of laytime shall count. Laytime (including free time) to be reversible.

At load and discharge ports Master can tender notice of readiness any time day or night Fridays/Holidays included, whether in port or not, whether in customs clearance or not, whether in berth or not, whether in free practique or not.

**CLAUSE 25**
Vessel to be loaded by Charterers free of any risk, liability and expense whatsoever to the Owners by shore gear / conveyor belt load system at the rate of 25,000 metric tons per day basis weather working days of 24 consecutive hours, Fridays and holidays included. However, loading with vessel's cranes/grabs might be necessary on occasions. If at loading port, shore gear / conveyor belt load system is not available, Charterers will request to load with vessel's gears / grabs at a loading rate / freight rate to be agreed.

**CLAUSE 26**
Vessel to be discharged by Charterers free of any risk, liability and expense whatsoever to the Owners by vessel's own cranes / grabs at the rate of 13,000 metric tons per weather working day of 24 consecutive hours Fridays and holidays included. Charterers guarantee that the take-away speed is not less than this rate.

Charterers warrant to do the following at the discharge port:

1. Provide sufficient number of trucks at all times to maintain un-interrupted discharge rate per above.

Rider Clauses to the Charter Party dated April 26, 2006 –
TBS Middle East Carriers Ltd / United Quarries

2. Place sufficient number of hoppers in free flowing condition maximum 5 meters away from the vessel. Failure to meet 13,000 metric ton discharge rate due to lack of sufficient number of hoppers in free flowing condition not to be responsibility of Owner.

3. Provide sufficient pay loaders/bobcats for each hold (within tanktop strength restrictions) in timely manner to bring the cargo to the center of the holds for vessel to maintain daily discharge rate of 13000 metric tons per day.

4. Provide experienced and competent crane operators to keep up with the vessel's discharge rate capability. Failure to meet 13,000 metric ton discharge rate due to slow work of crane operators not to be responsibility of Owner.

Any time lost due to Charterers not conforming to the above to count as used laytime or time on demurrage as the case may be.

CLAUSE 27
A hatch only to be considered non-workable in the event of vessel's crane breakdown or hatch cannot be opened due to a fault of vessel. In case of breakdown of vessel's cranes / grabs due to the fault of vessel time used/ lost will be deducted from laytime or time on demurrage on pro-rata basis to the number of vessel's cranes. However, no deductions to be made from laytime if breakdown arises because of act/neglect/omission of stevedores and/ or crane drivers.

CLAUSE 28
The vessel will have on board all necessary certificates to enable the vessel and her crew to carry the cargoes under this Charter Party.

CLAUSE 29
The Master to authorize vessel's agents at load port to issue and sign on his behalf bills of lading in strict conformity with mate's receipts. Bills of Lading to incorporate New Jason Clause, Both to Blame Collision Clause, P and I Bunker Clause, USA Clause Paramount, and Voywar 1993.

All Bills of Ladings shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities, which may arise from any inconsistency between this Charter Party and Bills of Lading.

All Bills of Lading issued for cargo loaded must contain the following language: "All terms and conditions, liberties and exceptions including the law and arbitration clause as per charter party dated April 26, 2006 between TBS Middle East Carriers, Ltd and United Quarries and any addenda thereto to be considered fully incorporated herein as if fully written, and anything to the contrary containing in this bill of lading notwithstanding. Any conflict between the bill of lading and the charter party, the charter party is to govern".

CLAUSE 30
All taxes/ dues on cargo and/ or freight or calculated on same for Charterers' account.

CLAUSE 31
Overtime, if required or used, to be for the account of the party ordering same. Overtime for ship's officers and crew always to be for the account of the Owner. Overtime ordered by port authority to be for Charterer's account. Shifting between berths if any ordered by port authority to be at Charterer's time, risk and expense.

CLAUSE 32
All port charges and any other expenses relating to the vessel are for the Owners account including taxes/ dues on vessel.

Rider Clauses to the Charter Party dated April 26, 2006 –
TBS Middle East Carriers Ltd / United Quarries

Any delays incurred as a result of failure of Owners to place agents in funds in advance to cover vessel's port disbursements, agency fees etc shall be for Owners account.

**CLAUSE 33**
Annual basic war risk insurance premiums and/ or calls in respect of hull and machinery of the vessel and owner's other interests including but not limited to, loss of earnings and detention, the crew and their protection and indemnity risks to be for Owner's account. Any increase in premium imposed on or after the date of this contract or additional premiums and/or calls for such insurance including blocking and trapping and any crew war bonus and/or additional wages are to be borne by Charterers and are due on presentation of Owner's invoices and are to be settled with Owners every 5 voyages.

~~Any extra war risk insurance premium including crew war bonus (if any) and blocking and trapping insurance to be for Charterers account and are due on presentation of Owner's invoices and are to be settled with Owners every 5 voyages.~~

Should the Owners invoke any provision of this Charter Party pertaining to war activities or war risks, as such are defined or described in the Voywar 1993 Clause, then Owners shall have the option to cancel the balance of this contract.

**CLAUSE 34**
For the first voyage, vessel to give to Charterers and their agents 7 days approximate notice of ETA load port and 24 hours notice of ETA discharge port. For subsequent voyages vessel to give 24 hours notice of ETA load/ discharge ports.

Notify Parties:

(a) **Load Port Agent:**
Merchant Shipping Services LLC
1st Floor, Sharaf Building
P.O. Box 2939
Dubai, U.A.E
Attn: Capt. Sorab Vesuna
Tel: +971-4-352-5999
Fax: +971-4-351-2999
Mobile: +971-50-650-8254
E-mail: s.vesuna@merchantdubai.com

(b) **Charterers:**
United Quarries
Fujairah, U.A.E.
Tel: +971 9 2220336
Fax: +971 9 2220337
Email: uniquary@eim.ae
Contact Persons:
Naim Marashly (Mobile / +971 50 6499225)

(c) **Shipper:**

Same as the Charterers.

(d) **Discharge Port Agent:**
National Shipping & Marine Services Company
P.O. Box 23113
Doha, Qatar
Attn Kerman Vesuna

Rider Clauses to the Charter Party dated April 26, 2006 –
TBS Middle East Carriers Ltd / United Quarries

Tel +974 435 8333
Fax +974 435 5446
Email nsm@qatar.net.qa

A sailing telegram is to be sent by the Master to discharge port agent and Charterers on leaving the load port giving sailing date, commodity, total cargo quantity loaded and estimated arrival draft at the discharge port.

**CLAUSE 35 – ARBITRATION CLAUSE:**
All disputes arising out of or in connections with this contract shall be exclusively arbitrated at New York in the following manner and subject to U.S. law:

One arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The arbitrators shall be commercial men, conversant with shipping matters. Such arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

For disputes where the amount claimed by either party does not exceed U.S $30,000., the parties may elect to conduct the arbitration in accordance with the shortened arbitration procedure of the Society of Maritime Arbitrators, Inc.

The arbitrators may grant any relief which they, or a majority of them, deem just and equitable and within the scope of the agreement of the parties, including but not limited to, specific performance. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any court having jurisdiction in the premises.

**CLAUSE 36**
Dispatch to be paid to Charterers for laytime saved in loading and/or discharging at half the demurrage rate. Dispatch to be settled directly between Owners and Charterers.

**CLAUSE 37**
Owners warrant that the vessel is not blacklisted by Arab Countries.

**CLAUSE 38**
The Owners shall have a lien on all cargoes carried hereunder and on all sub freights payable in respect of the cargoes, for freight, dead freight, demurrage, detention, claims for damages and for all other amounts due under this contract including costs of recovering same.

**CLAUSE 39**
In case original Bills of Lading are not available at the discharge port Owners will allow discharge to take place against letter of indemnity signed by an officer of the Charterers on Charterers' letter head with the name and title of the signing officer printed below the signature. Owners P and I Club wording to apply. Charterers to use their best endeavors to ensure original Bills of Lading are available at discharge port. Owner's privilege to not allow discharge until letter of indemnity is received in order by Owners. Any time lost to count as laytime or as time on demurrage as the case may be.

**CLAUSE 40**
Deleted.

**CLAUSE 41**
No cargo to be loaded in deeptanks and other inaccessible areas. Master has the liberty to load in such areas for the stability of the vessel but extra expenses incurred by reason of discharge from such spaces are to be Owners' account and laytime shall be calculated at half agreed discharge rate.

Rider Clauses to the Charter Party dated April 26, 2006 –
TBS Middle East Carriers Ltd / United Quarries

**CLAUSE 42**
Owners to provide onboard vessel class certificate, ship's registry certificate and a valid cargo gear certificate for the duration of this voyage prior loading of the vessel. The vessel is guaranteed to be fully P&I covered/classed for the whole duration of this contract.

Disponent Owners' P&I Club depends on the performing vessel.

Charterer's legal liability insurer: _____.

**CLAUSE 43**
Demurrage / dispatch, increase in premium, crew war bonus, and extra war risk insurance premium (if any) of each voyage is due on presentation of Owner's invoice and is to be settled every 5 voyages latest within 7 days after submission of owners' invoices by fax or e-mail.
 At no time will Charterers withhold any undisputed monies due Owners.
**CLAUSE 44**
This contract of affreightment is concluded on the basis of a price of U.S. $ 350 per metric ton of IFO 380 CST ISO 8217:2005 RME 180, U.S. $ 361 per metric ton of IFO 180 and U.S. $ 660 per metric ton MDO ISO 8217:2005 DMB ("the base prices").

If the prices actually paid by the owners during the period of this contract for the quantity consumed on the contracted voyage(s) are U.S. $5/metric ton or more higher or lower than the figures in the above paragraph, then the difference between the base prices and the prices actually paid shall be paid by the Charterers to the owners or Owners to Charterers as the case may be on production of the Owner's account thereof.

**CLAUSE 45**
The following provisions shall apply with respect to any applicable security regulations or measures:

Reporting
The Vessel or its agents shall report and send all notices as required to obtain entry and exit clearances from the relevant authorities.
Any delay caused by the failure to so report shall be for the Owners' account, unless such failure to report is caused by or attributable to the Charterers or their representatives or agents including but not limited to the shipper and/or receiver of the cargo.

Clearances
Unless caused by the Owners' negligence, any delay suffered or time lost in obtaining the entry and exit clearances from the relevant authorities shall count as laytime or time on demurrage.

Expenses
Any expenses or additional fees relating to the cargo, even if levied against the Vessel, that arises out of security measures imposed at the loading and/or discharging port and/or any other port to which the Charterers order the Vessel, shall be for the Charterers' account.

Notice of Readiness
Notwithstanding anything to the contrary contained in this Charter Party the Vessel shall be entitled to tender Notice of Readiness whether cleared for entry or not by any relevant authority.

**CLAUSE 46**
Each and every voyage of this contract shall be governed by the terms and conditions of this Charter Party.

Rider Clauses to the Charter Party dated April 26, 2006 –
TBS Middle East Carriers Ltd / United Quarries

**CLAUSE 47. ISPS Clause for Voyage Charter Parties**

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

December 14th, 2006

### Addendum No.1 to
### T.B.S. / United Quarries C.O.A. dated April 26th, 2006

It is this day mutually agreed between TBS Middle East Carriers, Ltd., of Marshall Islands, as disponent Owners, and United Quarries, of United Arab Emirates, as Charterers, that:

- In accordance with Clause 20 of the subject COA, Owners will substitute the m.v."Biloxi Belle" with:

  m.v."Alabama Belle"  Phil '86
  singledeck/bulkcarrier
  Class: Highest Lloyds +100A1
  = all details about =
  41,808 mtdw on 11.22 m ssw
  Loa 183.78 m / beam 30.53 m
  5 holds / 5 hatches
  4 x 25 tons cranes with grabs

  ETA Fujairah on/about January 05th, 2007

All other terms, conditions, exceptions and exemptions from liability, including the Arbitration Clause, of TBS/United Quarries COA dated April 26th, 2006, are to remain unaltered.

| For the Owners: | For the Charterers: |
|---|---|
| *signed* | *signed* |
| A. McDonagh | |
| For TBS Shipping Services Inc. | |
| TBS Shipping Inc. | United Quarries |
| As Agents | |

February 16th, 2007

1st ORIGINAL

Addendum No.2 to
T.B.S. / United Quarries C.O.A. dated April 26th, 2006

It is this day mutually agreed between TBS Middle East Carriers, Ltd., of Marshall Islands, as disponent Owners, and United Quarries, of United Arab Emirates, as Charterers, that:

- in accordance with Clause 20 of the subject COA, Owners will substitute the m.v."Alabama Belle" with:

  m.v."Manhattan Princess" Phil '82
  singledeck/bulkcarrier
  Class: Highest Lloyds +100A1
  = all details about =
  45,526 mtdw on 12.159 m ssw
  Loa 192.73 m / beam 29.65 m
  5 holds / 5 hatches
  6 x 25 tons cranes with grabs

  ETA Fujairah on/about March 1st, 2007

All other terms, conditions, exceptions and exemptions from liability, including the Arbitration Clause, of TBS/United Quarries COA dated April 26th, 2006, are to remain unaltered.

For the Owners:

For and on behalf of the Owners

S. McDonagh
for TBS Shipping Inc.
As Agents Only

TBS Shipping Inc.
As Agents

For the Charterers:

United Quarries

Yonkers, New York 10710

info@nyc.tbsship.com
www.tbsship.com

**WORKING COPY**   February 17th, 2006

### Addendum No.3 to
### T.B.S. / United Quarries C.O.A. dated April 26th, 2006

It is this day mutually agreed between TBS Middle East Carriers, Ltd., of Marshall Islands, as disponent Owners, and United Quarries, of United Arab Emirates, as Charterers, that:

> in accordance with Clause 24 of the subject COA, an address commission of 0.65 percent on freight only (not to be earned on demurrage) is due to the Charterers

All other terms, conditions, exceptions and exemptions from liability, including the Arbitration Clause, of TBS/United Quarries COA dated April 26th, 2006, are to remain unaltered.

For the Owners:                                        For the Charterers:


TBS Shipping Inc.                                       United Quarries
As Agents

