

**TBS SHIPPING SERVICES INC.**
612 East Grassy Sprain Road
Yonkers, New York 10710

tel: 914-961-1000
fax: 914-961-7609
info@nyc.tbsship.com
www.tbsship.com

ORIGINAL

Every TBS ship is a *partnership*.

March 4th, 2008

### Addendum No.4 to
### T.B.S. / United Quarries C.O.A. dated April 26th, 2006

It is this day mutually agreed between **TBS Middle East Carriers, Ltd.**, of Marshall Islands, as disponent Owners, and **United Quarries**, of United Arab Emirates, as Charterers, that:

- Nothwithstanding what is stated in Clause 13 of the subject COA
- The freight rate shall be adjusted to US $ 6.75/mt free in out/trimmed
- This freight adjustment will commence as of February 25th, 2008, namely m.v."Manhattan Princess" COA voyage No.90/Owners voyage No.39

All other terms, conditions, exceptions and exemptions from liability, including the Arbitration Clause, of TBS/United Quarries COA dated April 26th, 2006, are to remain unaltered.

**For the Owners:**

On behalf of the Owners.

M.J. M_____
for TBS Shipping Services Inc.
TBS Shipping Inc.
As Agents



**For the Charterers:**

United Quarries



May 7th, 2008

### Addendum No 5 to
### T.B.S. / United Quarries C.O.A. dated April 26th, 2006

It is this day mutually agreed between TBS Middle East Carriers, Ltd., of Marshall Islands, as disponent Owners, and United Quarries, of United Arab Emirates, as Charterers, that:

- Notwithstanding what is stated in Clause 20 of the subject COA the demurrage rate shall be adjusted to US $ 24,500 per day or pro rata with half despatch on laytime saved both ends
- This adjustment will commence from the first voyage after March 01st, 2008, namely m.v. "Manhattan Princess" COA voyage No.90/Owners voyage No.09 and m.v. "Mohawk Princess" COA voyage No.93/Owners voyage No.52

All other terms, conditions, exceptions and exemptions from liability, of TBS/United Quarries COA dated April 26th, 2006, and Addenda thereto, are to remain unaltered.

For the Owners:

TBS Shipping Inc.
As Agents

For the Charterers:

United Quarries



 

TBS SHIPPING SERVICES INC.
612 East Grassy Sprain Road
Yonkers, New York 10710

tel: 914-961-1000
fax: 914-961-7609
info@nyc.tbsship.com

February 20th, 2008

## Addendum No.6 to
## T.B.S. / United Quarries C.O.A. dated April 26th, 2006

It is this day mutually agreed between **TBS Middle East Carriers, Ltd.**, of Marshall Islands, as disponent Owners, and **United Quarries**, of United Arab Emirates, as Charterers, that:

- Nothwithstanding what is stated under Addendum no.4 to the subject Contract of Affreightment the freight rate will be reduced to U.S.$ 4.75/mt free in and out/trimmed

- Notwithstanding what is stated under Addendum No. 5 dated May 07th, 2008, to the subject Contract of Affreightment the demurrage rate shall be reduced to US $ 14,000 per day or pro rata, with half despatch on laytime saved both ends

- This adjustment will commence from the "Manhattan Princess" voyage commencing January 17th, 2009 (COA voyage no.110/TBS voyage no.57) and subsequent vessels for a period of six months, until August 17th, 2009.

All other terms, conditions, exceptions and exemptions from liability, of TBS/United Quarries COA dated April 26th, 2006, and Addenda thereto, are to remain unaltered.

**For the Owners:**                                           **For the Charterers:**

For and on behalf of the Owners,

_[signature]_
M.J. Morgan
for TBS Shipping Services Inc.
As Agents Only.
TBS Shipping Inc.
As Agents

United Quarries



TBS SHIPPING SERVICES INC.
612 East Grassy Sprain Road
Yonkers, New York 10710

tel: 914-961-1000
fax: 914-961-7509
info@nyc.tbsship.com

ORIGINAL

May 18, 2009

## Addendum No. 7 to
## Contract of Affreightment dated April 26, 2006 between
## TBS Middle East Carriers, Ltd. and
## United Quarries, Ltd.

It is this day mutually agreed between **TBS Middle East Carriers, Ltd.** of Marshall Islands, as Owners and **United Quarries Ltd.** of Fujairah, U.A.E., as Charterers, that:

M.V. Mohawk Princess will be withdrawn from the subject contract after completion of her voyage No. 75, leaving only M.V. Manhattan Princess to complete the contracted quantity.

M.V. Manhattan Princess to go to drydock in China sometime during September 2009 and return back into this contract after the completion of drydock.

M.V. Mohawk Princess or a substitute vessel to replace M.V. Manhattan Princess while she is away for drydock.

The two parties agree that M.V. Manhattan Princess dry-docking period is to be for a limited specified period of three to four months time, after which the particular vessel M.V. Manhattan Princess or a substitute vessel of the same size and capacity will replace M.V. Mohawk Princess, if M.V. Manhattan Princess is still not ready to resume operations after the agreed time frame.

If the demand for aggregates improves in Qatar and the charterers want another vessel to enter the contract, then same to be discussed between the owners and the charterers.

All other terms, conditions, exceptions and exemptions from liability to the subject contract and Addenda thereto are to remain unaltered.

For the Owners:
For and on behalf of the Owners. (As per Authority)

_____
TBS Shipping Services, Inc.
(As Agents Only)

For the Charterers:
For and on behalf of the Charterers

_____
United Quarries
Naim J. Marashly
Managing Director/Partner




# EXHIBIT

# B

# GERARD T. DESMOND

545 Robin Lane
Jupiter, Fl. 33458
Phone (561) 290 4878
Cell (203) 952 1327
GDD917@aol.com

November 8, 2013

CARDILLO & CORBETT

NOV 1 3 2013

RECEIVED

VIA FEDERAL EXPRESS

Tulio R. Prieto
Cardilllo & Corbett
29 Broadway
New York, N.Y. 10006

Re:     Arbitration Award
        TBS Middle East Carriers, Ltd and United Quarries
        Dated November 11, 2013

Dear Tulio;

We are pleased to enclose herewith the above Arbitration Award signed by the Arbitratos along with Appendix A dated November 11, 2013.

We appreciate the opportunity to be of service in these proceedings.

Very truly yours,

*[signature]*

Gerard T. Desmond

```
*************************************************************
In the Matter of the Arbitration                *
                                                *
        between                                 *
                                                *
TBS MIDDLE EAST CARRIERS, LTD.,                 *
        as Disponent Owner,                     *
                                                *
        -and-                                   *   FINAL AWARD
                                                *   November 11, 2013
                                                *
UNITED QUARRIES, as Charterer,                  *
                                                *
Under a Gencon Form Contract of                 *
Affreightment dated April 26, 2006              *
*************************************************************
```

Before:  Charles L. Measter, A. J. Siciliano and Gerard T. Desmond, Chairman

For:    TBS Middle East Carriers, Ltd.
        Cardillo & Corbett
        by Tulio R. Prieto, Esq.


For:    United Quarries
        S.G. Chancery Chambers
        by Sunil George, Esq and Shafi Mogral, Esq.

        Wanchoo Law Offices, LLP
        by Rahul Wanchoo, Esq.
        Aglaia Davis, Esq.


## Background

These disputes arose under a Contract of Affreightment (COA) dated April 26, 2006 at Dubai on a modified Gencon form between TBS Middle East Carriers, Ltd. of Majuro, Marshall Islands, as Disponent Owner (hereinafter "TBS" or "Owner") and United Quarries of Fujairah, U.A.E (hereinafter "UQ" or "Charterer"). The COA called for the annual carriage of about 2,000,000 metric tons of crushed gabbro aggregate in bulk, 5%

more or less in TBS's option, for a period of three years or a total quantity of about 6,000,000 metric tons. The liftings were to begin May, 2006 and carried in lots of 35,000 to 50,000 metric tons, 10% more or less in TBS's option, from one safe berth Fujairah, U.A.E., to one safe berth, Mesaieed, Qatar.

A total of 134 liftings were made under the COA. Except for the proper reconciliation of accounts, there is no dispute between the parties with respect to either the $30,271,436.75 freight or $18,195,408.73 demurrage earned by TBS under the COA. Rather, this dispute centers mainly on the claims by TBS totaling $1,655,394.49 [1] which amount is composed of $122,753 found in its favor following the reconciliation of accounts, $25,696.78 for the reimbursement of shifting expenses including bunkers at Mesaieed, $138,162.15 for additional war risk premiums and $1,368,782.56 for bunker escalations invoiced to but not paid by UQ.

Charterer not only denies responsibility for the amounts claimed by TBS, but asserts a counter claim for $605,835.57 representing an address commission of 1.25% payable on both the gross freight and demurrage earned by TBS. Relying on the unsigned Addendum 3 to the COA, TBS contends UQ is due an address commission of 0.65% payable only on freight earned.

The negotiations leading to this COA were begun and conducted primarily between Mr. Bipin Gandhi, as "Executive Vice President, Business Development" for TBS[2] and Mr. Naim Joseph Marashly, as Managing Director/Partner of United Quarries. The spelling of the "Marashly" name differs among the documents presented to the panel. On the COA the name is spelled " Marashly" whereas on the declaration prepared by Counsel the name is spelled "Marachly". Although no explanation has been offered for this difference, the panel has examined the actual signatures and is satisfied that the

---

[1] TBS actually claimed $1,659,271.45 or $3,876.96 more than the total of its individual claims.
[2] A member of the publicly traded TBS Shipping Services, Inc. group of companies.

documents before us were signed by the same person. For purposes of this award, the panel has opted to use "Marashly" (as that is the spelling that appears most often in the documents) with the understanding that any reference thereto also includes "Marachly".

UQ was negotiating a three (3) year contract with Qatar Quarries & Building Materials Co. for the supply of some two (2) million metric tons of gabbro aggregate per year and was in need of reliable handymax tonnage to transport the product from Fujairah to Masaieed. It is Charterer's contention that Mr. Gandhi represented himself to be a Senior Executive in the Chartering Division of TBS and, as such, in position to offer UQ the best rate and terms for a contract. According to UQ, Mr. Gandhi assured Mr. Marashly that he (Gandhi) would be the main contact person at TBS and would remain available to resolve any issues that might arise.

Mr. Marashly states that he is not fluent in English and that this COA was his first experience with a freight contract. He, therefore, relied upon and so trusted Mr. Gandhi that he accepted the charter agreement proffered by TBS without fully understanding its terms. According to Mr. Marashly, his discussions with Mr. Gandhi only concerned freight and demurrage and nothing was said about UQ having to pay bunker escalations, shifting charges, or additional war risk insurance premium. Mr. Marashly was presented with a COA, described to him as very reasonable, which both he and the chairman of UQ readily signed. At no time did Mr. Gandhi or anyone at TBS suggest that UQ consult a third party to explain the terms of the COA contract. Actually, Mr. Marashly signed three versions of the COA, all of which were dated April 26, 2006, but only one[3] was also signed by UQ's chairman and TBS. The panel considers the jointly executed version to control this dispute and we quote below those portions of its clauses that we regard as relevant to the parties' quarrel.

---

[3] Charterer's Exhibit 4, Owner's Exhibit A

Although the precise date is unclear, it is likely that on or about the time the COA was signed, UQ was aware that TBS had terminated Mr. Gandhi's employment. Trade publications dated March 24, 2006 reported that TBS had terminated Mr. Gandhi's employment after he pled guilty to 6 felony counts including conspiracy to commit money laundering, bid rigging, wire fraud and income tax evasion.

**Relevant COA Clauses**
In pertinent part, the clauses that impact these disputes read as follows:

Clause 31 - (Shifting)
"... Shifting between berths if any ordered by the Port Authority to be at Charterer's time, risk and expense."

Clause 32 - (Port Charges)
"All port charges *and any other expenses relating to the vessel are for Owners (sic) account* including taxes/dues on vessel." (Italics and underlining added)

Clause 33 - (War Risk Premium)
"Annual basic war risk insurance premiums and/or calls in respect of hull and machinery of the vessel and owner's other interests including but not limited to, loss of earnings and detention, the crew and their protection and indemnity risks to be for Owner's account. Any increase in premium imposed on or after the date of this contract *or additional premiums and or calls for such insurance including blocking and trapping and any crew war bonus and/or additional wages are to be borne by Charterers* and are due on presentation of Owner's invoices and are to be settled with Owners every 5 voyages." (Italics and underlining added)

Clause 35 - (Arbitration Clause)
"All disputes arising out of or in connections with this contract shall be exclusively arbitrated at New York in the following manner and subject to U.S. law:

One arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The arbitrators shall be commercial men, conversant with shipping matters. Such arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

For disputes where the amount claimed by either party does not exceed U.S. $30,000., the parties may elect to conduct the arbitration in accordance with the shortened arbitration procedure of the Society of Maritime Arbitrators, Inc.

The arbitrators my grant any relief with they, or a majority of them, deem just and equitable and within the scope of this agreement of the parties, including but not limited to, specific performance. Awards made in pursuance of this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any court having jurisdiction in the premises."

Clause 44 – (Bunker Escalation/Descalation)
"This contract of Affreightment is concluded on the basis of a price of U.S. $350.00 per metric ton of IFO 380 CST ISO 8217:2005 RME 180,, U.S. $361.00 per metric ton of IFO 180 and U.S. $660 per metric ton MDO ISO 8217:2005 DMB ('the base prices').

If the prices actually paid by the owners during the period of this contract for the quantity consumed on the contracted voyage(s) are U.S. $5/metric ton or more higher or lower than the figures in the above paragraph, then the difference between the base prices and the prices actually paid shall be paid by the Charterers to the owners (sic) or Owners to Charterer as the case may be on production of the Owner's account thereof."

Addendum 3 dated February 17, 2006[4] - ADDRESS COMMISSION
" … in accordance with Clause 24 of the subject COA, an address commission of 0.65 percent on freight only (not to be earned on demurrage) is due to the Charterers …"


**The Proceeding**
On March 20, 2011, TBS demanded Arbitration under Clause 35 of the Charter Party and nominated Charles L. Measter as its appointed arbitrator. In response, UQ appointed A. J. Siciliano. The two thus chosen arbitrators then appointed Gerard T. Desmond to serve as third arbitrator and panel chairman for procedural matters. Following the arbitrators' customary disclosure statements, the parties accepted the panel as constituted and advised that the matter would proceed on documents alone. Since no hearings took place, the panel had no opportunity to observe or probe witnesses on the precise role played by Mr. Gandhi, the several misrepresentations Mr. Marashly attributes to him, or to the veracity of Mr. Marashly's statements concerning his lack of shipping experience and limited command of the English language.

---
[4] Note that Addendum No. 3 is dated more than two months prior to the COA.

Counsel for TBS has presented voluminous exhibits and calculations covering all of the 134 individual vessel voyages performed under the COA against UA's submission of some 40 exhibits. The parties also submitted sworn affidavits and exchanged post submission main, reply and sur-reply briefs.

## Discussion and Decision

### The Role of Bipin M. Gandhi

UQ contends that the entire COA is voidable by reason of the misrepresentations made by Mr. Gandhi, as the representative of TBS. Charterer's Exhibit 28 is an article from the March 24, 2006 edition of *Tradewinds*, reporting that TBS terminated Mr. Gandhi after an earlier article revealed that he had pled guilty to "... six felony counts, including conspiracy to commit money laundering, bid rigging, wire fraud and income-tax evasion." It is important to note that none of the reported infractions involved TBS or took place while Mr. Gandhi was employed by TBS. On the contrary, all are understood to have occurred during Mr. Gandhi's prior employment with an entirely different owner.

Turning to the allegations put forward by UQ, we note that no pre-fixture emails or fixture recaps are in evidence. The absence of such customary documentation lends support to the notion that at least the main terms of the COA were negotiated directly between Mr. Marashly representing UQ and Mr. Gandhi representing TBS. That said, given the aforementioned *Tradewinds* article, it is unclear whether Mr. Gandhi was still an employee of the TBS when those negotiations began or were concluded. However, it does appear that he was terminated some time before the COA date of April 26, 2006 and certainly prior to his May 11, 2006 email to UQ[5] thanking its board of directors for concluding the three years COA and asking them to meet with TBS's then chairman, Joseph E. Royce, which meeting took place early in June 2006.

---

[5] Charterer's Exhibit 29

Mr. Marashly insists that he and Mr. Gandhi never discussed any items for UQ's account, beyond the payment of freight and demurrage. On this basis, UQ denies all responsibility for the claims brought against it by TBS in this proceeding. However, freight and demurrage are among the essential items commonly referred to as "main terms" which are routinely agreed before parties attempt to negotiate the language and more lengthy terms of the actual contract. We believe that is what occurred here. More importantly, the arbitrators are required to decide the disputes on the best evidence available which, in this case, we consider to be the jointly signed version of the COA.

As hereinafter discussed in greater detail, each of the reimbursement claims made by TBS is prominently addressed in the jointly signed COA, and in a least one earlier version signed only by Mr. Marashly. Thus, notwithstanding what may have transpired between Mr. Marashly and Mr. Gandhi, UQ had ample opportunity to examine the contract's terms and consult lawyers or more experienced third parties to explain UQ's prospective legal obligations before actually signing the COA. Contrary to UQ's assertions, TBS had no obligation to suggest that UQ seek expert counsel. Insofar as Mr. Marashly's less than perfect command of the English language is concerned, we note that the underlying three year supply contract between UQ and Qatar Quarries & Building Materials Co. was also in English. Obviously, Mr. Marashly was sufficiently comfortable with his understanding of English to conclude two very substantial companion contracts in that language.

In summary, irrespective of whether Mr. Marashly's trust in Mr. Gandhi was or was not misplaced, we find that UQ willingly signed the COA and having done so is bound by its terms. We find no grounds to dismiss the claims of TBS or excuse UQ's contract obligations based upon alleged misrepresentations which not only are uncorroborated but are contradicted by the express terms of the jointly signed COA. Instead, the arbitrators have opted to examine and decide each of the claims made by TBS against

the language of the COA and their best understanding of the supporting documentation.

### The Reconciliation of Accounts

Initially UQ insisted that TBS had failed to account for payments of $272,600, $254,550 and $255,002.71 and, consequently, UQ was entitled to an equivalent credit for same. In the Declaration of its Risk Manager, Barry P. Leff, TBS reviewed the payment records and furnished persuasive evidence that UQ had indeed been given due credit for the $272,558.22 payment received May 2, 2007 as well as the $254,795.00 received August 13, 2007.[6] Mr. Leff did confirm that UQ had not been credited with its payment of $254,550, but had mistakenly been credited with $377,303 representing payments from another charterer. After deducting the omitted UQ payment of $254,795 from the erroneous $377,303 credit, the result was a $122,753.00 net increase in the claim of TBS against UQ, which amount we hereby award TBS.

### WAR RISK PREMIUMS.

TBS has presented invoices totaling $138,162.15 covering the *"additional premiums"* charged by War Risk underwriters for the several vessel calls at Masaieed, an excepted war risk area. Pursuant to the express terms of COA Clause 33, those charges are for the account of UQ. The several insurance broker invoices presented adequately support the charges claimed by TBS. Accordingly, we hereby award TBS reimbursement of the sum of $138,162.15, as claimed.

### SHIFTING EXPENSES

TBS relies on Clause 31 to justify its claim for shifting expenses, including bunkers consumed during the shift between berths. However, as Clause 31 does not expressly allocate the cost of such bunkers to either party, the panel has also focused its attention on Clause 32. We consider that the phrase "*and any other expenses relating to the vessel are*

---

[6] Bank charges and processing delays caused the dates and amounts UQ sent to differ slightly from the dates and amounts TBS received.

9

*for Owners (sic) account*" from Clause 32 can be read to include the bunkers claimed for shifting between berths. Having searched but finding nothing in the record to favor TBS's interpretation of Clause 31 over the language of Clause 32, the panel considers both clauses to be somewhat ambiguous as concerns the allocation of the bunkers consumed for shifting between berths. As the COA was authored by TBS, we are obliged to resolve that ambiguity against Owner and disallow that portion of its claim.

On March 27, 2008 the Masaieed agent advised that as of March 1, 2008, the Port Authorities discontinued the imposition of shifting expenses for port convenience, but any shifting expenses already invoiced and paid prior to March 1, 2008 would not be refunded. Thus, UQ contends there were no reimbursable shifting expenses imposed upon TBS nor proof that TBS actually paid the charges claimed.

However, the record is clear that effective March 2009, the Port Authority resumed imposing such fees. Accordingly, TBS claims reimbursement for the shifting expenses imposed by the Port Authority prior to the March 2008 suspension and subsequent to the March 2009 resumption of such expenses. The claim admittedly also includes shifting expenses in addition to those imposed by the Port Authority.

Mindful that Clause 31 only entitles TBS to recover those shifting expenses incurred by order of the Port Authority, the panel searched the exhibits for evidence that was indeed the case for all 14 voyages claimed by TBS. Our search uncovered satisfactory evidence that the shift was ordered by or for the convenience of the Port Authority in only eight (8) of those voyages. We have, therefore, disallowed the shifting expenses claimed for the voyages corresponding to Exhibits D-23, D-36, D-79, D-81, D-93 and D-132. Pursuant to our finding that fuel consumed during shifting is more properly chargeable to Owner under Clause 32 than to the Charterer under Clause 31, we have also deducted the fuel portion of TBS's claim from the eight (8) qualifying voyages. Accordingly, we hereby allow TBS the sum of $13,115.71 representing the shifting